# CASES DETERMINED

# SUPREME COURT of JUDICATURE

OF THE

## ·STATE OF NEW JERSEY,

AT NOVEMBER TERM, 1861.

---

PETER E. VOORHEES *vs.* J. W. JONES, impleaded, &c.

1. If A and B contract with a railroad company to build their road, and afterwards sell and assign to C and D a part of the contract, so that C and D shall be equally interested with A and B in the profits of the contract, C and D become partners and jointly liable with A and B for work done on the road; and where a note is given for labor or materials signed "A and B," C and D will be liable on such note as partners.

2. An agreement to sell and transfer an interest in a business carries with it, as a consequence, the right to a share of the profits.

3. The members of a firm cannot enjoy all the benefits of a partnership, and by a secret agreement between them, that they shall not be considered partners, exempt themselves from the liabilities arising from the partnership relation.

4. If A and B, who have a contract for building a railroad, agree to pay to C one-third of the profits of the contract, in consideration of his services in procuring the contract and the benefit of his skill and experience in constructing the railroad, it does not constitute C a partner, and make him liable for labor and materials used in building the road.

5. In a suit by creditors against the parties to a written agreement, by

270

Voorhees v. Jones.

the terms of which all were partners, *held*, that none of those who signed it could show by parol testimony that they were not considered partners by the others, and not liable, as such, to creditors.

6. A party who becomes an ostensible partner, or is so *inter sese*, is liable for the debts of the firm, even if by an agreement with a third person such third party becomes entitled to the partner's share of the profits; but a partner may show that by a sale of his interest to a third party he has retired from the firm, and is thereby relieved from the liabilities pertaining to the partnership, created after his retirement.

7. Where interrogatories served by a party are not answered within the time required by law, the party serving them is not bound to receive the answer; but if he receives the answer without objection after the time has expired, and permits the case to proceed to trial, he cannot afterwards object to the answer as not received in time.

8. If a party fails to answer interrogatories served on him within the time required by law, it does not, since the passage of the act of 1859, (*Nix. Dig., p.* 928,) prevent him from being a witness in his own behalf.

On rule to show cause.

Argued before the Chief Justice, and Justices OGDEN and BROWN.

*Wurts* and *Vansyckel*, for plaintiff.

*Richey*, for defendant.

The CHIEF JUSTICE. The only question at the trial was, whether the defendant was a partner in the firm of Seymour & Tower. The court directed a verdict for the defendant, upon the ground that the plaintiff had entirely failed to give any legal evidence of the partnership; that neither the agreements and documents offered in evidence, nor the testimony of the witnesses, showed any such agreement to participate in the profits of the business as to make Jones responsible to creditors.

The action of the plaintiff was upon a note made by Seymour & Tower.

The rule is well settled that whenever a person becomes entitled to an actual participation in the profits of the joint business as profits, so as to entitle him to an ac-

count and give him a specific lien on the partnership assets for payment of his share of the profits, in preference to the creditors of the individual partners, he becomes a partner as to creditors of the firm, although it may be expressly agreed between them that he shall not be so considered. The members of a firm cannot enjoy all the benefits of a partnership, and, by a secret agreement among them that they shall not be so considered, exempt themselves from the liabilities that flow from the relation. *Brundred et al.* v. *Muzzy and Welles*, 1 *Dutcher* 279; *Collyer on Part.* 81; *Waugh* v. *Carver*, 1 *Smith's L. C.* 968; 2 *H. Black.* 235; *Grace* v. *Smith*, 2 *W. Black.* 998; *Cushman* v. *Bailey*, 1 *Hill* 527.

But if the profits are taken in the character of an agent or servant as a mere compensation for services, and the party is so held out to the world, he is not, even as to creditors, held to be a partner. It seems to me that the true limitation upon the general rule is very clearly expressed by Story, in his work on *Partnership*, § 38. This is the rule in Massachusetts, 6 *Metcalf* 82, *Denny* v. *Cabot;* in Connecticut, in *Loomis* v. *Manhall*, 12 *Conn.* 69; *Perrine* v. *Hankinson*, 6 *Halst.* 181; in New York, *Vanderburgh* v. *Hull*, 20 *Wend.* 70; 3 *Kent's Com.* 25, 4th ed.; *Champion* v. *Bostwick*, 18 *Wend.* 184.

This limitation upon the rule seems eminently just. Why should a mere employee of a firm, who is bound to obey orders to transact all the business under the direction of his superiors, who has no control over the operations of the firm, who cannot limit its operations or direct its investments, be held liable to creditors, the contraction of whose debts he could not prevent if he had desired, and this not because he had agreed to become a silent partner, but merely because his compensation was contingent upon the success of the business.

The judge at the circuit thought the case now before the court fell within the principle of the cases just cited, and so ruled when he directed a verdict for defendant.

Seymour and Tower were contractors with the Northern Railroad Company for the building of their road, and also had an agreement for the lease of the road. The firm was engaged in the construction of the road, and the plaintiff's debt was contracted for services in laying the track.

On the sixth February, 1858, Seymour and Tower agreed, under their hands and seals, to pay over to one Thomas Cummings, Jr., the one-third part of the net profits of the contract for building the road, when received by them, and also the one-third of the net profits to be made from the running of the road. The paper declares that these payments were to be made to compensate him for services in procuring the contract from the company, and by it he stipulates to give them the benefit of his experience, skill, and judgment in the construction of the road.

On the eighth day of November following, Cummings, by an assignment endorsed upon the last-mentioned agreement, conveyed to Dana and Jones, the defendants, his entire interest in the "within described contract for constructing and equipping the Northern Railroad of New Jersey," made between Seymour and Tower and the company, and one-half of his interest in the lease of the road, thereby giving Dana and Jones the entire control, benefit, and advantage of his interest thereby assigned. The consideration expressed in this agreement was $20,000, paid by them to Cummings.

I think the legal effect of the agreement between Seymour and Tower and Cummings was not to make him a partner with them. He was to be paid for his services rendered in procuring the contract to build the road and the lease, one-third part of the net profits of the construction, and also of the lease. It was a compensation for his past and future services as as employee of the company; he was not to have any control over the work or any lien on the profits in preference to the creditors of the partners. The agreement does not convey to him in terms

any interest in the business or contract; it is a simple cove-
nant to pay to him one-third of the profits, when received
by Seymour and Tower; he has no right to receive them
himself. The agreement seems to have been drawn with a
view to the rules regarding the liability of an employee,
agent, or servant, so as not to charge Cummings with any re-
sponsibility.

If the parties intended that Cummings should have all the
substantial rights and powers of a partner, the agreement
does not express by its terms that meaning, nor does the as-
signment of his interest by Cummings to Dana and Jones do
anything more than transfer Cummings' rights to Dana and
Jones by its terms of *assignment*. Cummings could only
assign what he had.

But in this assignment Cummings and Dana and Jones
put a construction upon the agreement between Cummings
and Seymour and Tower, which, if it was what the parties
intended by that agreement, alters very materially its scope.
The matter assigned is stated to be his interest *in the contract*
for constructing and equipping the Northern Railroad and
half his interest in the lease.

If Cummings was not to be relieved from the responsibility
of a partner, it was because he had no interest in the busi-
ness, but was a mere agent or employee, having no con-
trol over the business, receiving, by contract personal to
the partners, and not affecting the partnership business,
a compensation for past and future services, ascertained
and rated by what the share of the profits mentioned
would amount to. If, therefore, Seymour and Tower, by
any paper executed between them and Cummings, by ex-
pression or fair implication, so modified the original con-
tract by which Cummings acquired his rights as to give
his assignees a share in the contract and lease and the
business, and entitle them to the substantial rights of
partners in the control of the business and receipt of its
profits, then, by force of such modification, they became
partners.

This brings us to the consideration of the agreement of the tenth of November, sealed by Seymour and Tower and Jones and Dana. It recites that Jones and Dana had, with their consent and approbation, bought the entire interest of Cummings in the contract for construction and equipment, and one-half his interest in the lease, for $20,000, and that Jones and Dana had agreed to assist in raising money for the completion of the work, by the use of their own and their friends' names and influence, and had assisted before that in the same way, and Seymour and Tower agreed that the $20,000 should be paid out of the price for construction, and should be charged to profits and loss before any division of the profits of the contract, and they thereby assigned, sold, and transferred to Dana and Jones one-sixth part of the entire contract for construction and equipment of the road, and one-fourth part of the entire lease of said road, with all the benefits, profits, and advantages derived and to be derived from the construction, equipment, running, and working of said railroad under said contract and lease, it being the intention of this agreement to make the interest of Dana and Jones, in all respects, equal with Seymour and Tower's interest in both said contract and lease. After other stipulations, the closing stipulation is that the business shall be conducted in the name of Seymour and Tower. By this agreement, beyond a doubt, Seymour and Tower and Dana and Jones became partners, not only as to creditors, but *inter sese*.

It was not a mere ratification of the transfer of Cummings' rights to Dana and Jones, but a sale of the one-sixth interest in the construction contract, with all its privileges and benefits, to Dana and Jones. It was a sale and conveyance of an interest in the business itself, with its profits, an interest which Dana and Jones acquired by the assignment directly from Seymour and Tower, and not through Cummings. Cummings sold them one-third, Seymour and Tower had two-thirds; they sold them one-

sixth, that is, divided the odd one-third, which they had more than Dana and Jones, between them, and thus made them all equal in that contract. They also sold them one-fourth of the lease itself, in so many words. They already had one-sixth, which they bought of Cummings, which gave them five-twelfths, leaving also five-twelfths of the lease in Seymour and Tower, and one-sixth in Cummings, which he had not sold to Dana and Jones. The agreement was not to pay a part of the profits to them for services, but an absolute sale of an interest in the business of Seymour and Tower, which carried with it, as a consequence, the right to a share of the profits.

The agreement expressly declares it to be the intention of the parties to make the interest of the parties in the contract and lease equal. What was the contract? It was a right to do certain work for the railroad company. What was the interest in the contract but an interest in the job, in the right to do the work? It was to be a joint interest in doing certain work, and getting the payment for it, giving to all the parties having this joint interest equal control and equal responsibilities.

I cannot see how a clearer interest in a partnership and its business can be created than was done by this agreement short of words saying that they are admitted as partners.

It is to be observed that they were to have this interest in consideration of services they had rendered in the financial department of the business, which they were to continue to render. They not only had an interest in the profits, *as such*, but that interest arose not from an agreement to pay them, but because of a conveyance of the fund out of which they were to come.

There was no agreement that they, Seymour and Tower, should do the work without them, and they reap a part of the profits; on the contrary, they and their friends were to contribute credit and money, by which the work was to be carried on.

The learned judge erred in the construction which he put upon the contracts.

But it was argued that the defendant, Jones, was not a partner, because, although he might so appear by the papers, he acted as a mere *locum tenens* for Demarest, the president of the road ; that it was verbally understood among all the parties that Jones had no interest ; that what appeared to be his, was in reality Demarest's.

It was objected, at the trial, that this verbal testimony, inconsistent with the import of the papers, was not admissible.

If therefore, as was argued, all the parol evidence showed this understanding, was parol evidence competent for that purpose ? and, if competent, did it show anything more than that Jones was a trustee without beneficial interest ? These are the questions to be decided. And—

1. Was it admissible ?

The creditor says—you, by the agreements between you, which, in an action against you by Jones would conclude you, are partners. Jones replies—true, I can hold them as partners, and so can they me, and the verbal agreement would be no defence to them or me because we are parties to it ; you are not, and therefore we are not estopped by them from showing the true relation between us. The answer is, that although the creditors are not partners to the agreement in writing they are so far privies in contract as to give them the right for their own protection to enforce the legal obligations of the partners to one another, to contribute to a joint fund for the benefit of creditors, and the rule excluding parol evidence which would be inadmissible between the parties applies in favor of creditors of those who have thus agreed to be jointly bound.

I think it is clear that in a suit by a creditor for his debt, a person who by the articles appears to be a partner shall not be permitted to show by parol evidence that he

never was, that the instrument did not contain the true agreement. That was the effort in this case.

It is another question, whether his retirement from the firm may not be proved by parol. The evidence was inadmissible for the purpose offered.

As to the second question, the evidence, even if received and weighed, showed that Jones agreed to take the liabilities of a partner without the profit, for the benefit of Demarest, to enable him to perpetrate a fraud on the directors of the company of which he was president. They permitted him to manage the affairs of the company on the ground that his interest was adverse to that of the contractors, and Jones took his place as partner in the contract to enable him to commit his fraud.

A party who agrees to be an ostensible partner, or is so *inter sese*, is liable for the debts of the firm, although there may be a collateral agreement between the partner and a third person that he is to have all the profits of the partner. *Collyer on Part.* 385; *Story on Part.* 670, and cases there cited.

Whether Jones had retired from the firm as the partner, and Demarest taken his place, so as to dissolve the legal relation between Jones and the other partners, and form a new one between Demarest and them, was a question of fact, which ought to have been submitted to the jury. Whether the assignment alluded to by Jones in his evidence, and also by Demarest, passed the entire interest of Jones to Demarest, does not seem to have been shown: the assignment was not produced at the trial, and was itself the best evidence of what passed by it. Nor does it satisfactorily appear that it ever was delivered with a view to put an end to Jones' ostensible interest. Nor did it appear by the evidence that its execution and delivery ever was known or assented to by Seymour and Tower.

The fact of its being handed back to Jones would seem to indicate that it was never permanently out of his posses-

sion. Demarest did not admit that he took the interest of Jones, whatever it was, or assumed his place in the firm. It is sufficient that the assignment was not legally proved.

It was objected that Jones was not a competent witness, because he had neglected to answer the interrogatories served by plaintiffs within fifteen days. *Nix. Dig.* 888.

The answers to the interrogatories were served on the plaintiff's attorney on the first day of the term. He was not bound to receive them at that time, but he did so without objection. That was a waiver of the objection, particularly as he permitted the case to proceed without objection until after he had rested his case. By receiving them, and keeping them without objection until the defendant's hands were tied, he precluded himself from the benefit of the objection.

Although I cannot see what power the judge had at that stage of the case, without the notice of two days which the act requires, to give further time to answer them ; if the first answers were well served, this could not have prejudiced the party.

There is another answer to this objection. The act provides that, in default of answering the interrogatories, the party shall not be allowed to testify in his own behalf on the trial of the action. This must mean in cases where he then was permitted so to do, unless we hold that clause, by implication, to have made him competent in his own behalf when he did answer them. The right, as it then existed, was to testify in his own behalf when called by the adverse party. This provision was a limitation on that right, not an extension of it. When, therefore, by the subsequent act of 1859, the party to the suit was made a competent witness in all cases, his right to give evidence in his own behalf was given without any such restriction. In this case Jones was not called by the plaintiff, but in his own behalf. He was competent within the strictest construction of the act of 1859, even if we should

not hold, as I think we should, that the act of 1859 allows the testimony of the party in all cases, no matter by whom called, even when he has failed to answer interrogatories.

The verdict should be set aside, and a new trial granted, that a verdict may be had on the issues of fact involved in the case. I am not satisfied that justice has been done in the case. It is plain that either Jones or Demarest is liable to the plaintiff. I think there would be gross injustice done by discharging Jones until there is ample proof that Jones had assigned his interest, and Demarest taken it when the note was made.

VREDENBURGH, J.   This is a suit brought by the plaintiff against the defendants on a note of hand, drawn in the following words :

"$2028.78.                    Hoboken, May 11th, 1859.

"Sixty days after date we promise to pay to the order of Peter L. Voorhees, Esq., two thousand and twenty-eight .78 dollars, at the Atlantic Bank, New York city, value received.

Seymour & Tower."

Also for work and labor.

The allegation of the plaintiff is, that the words "Seymour & Tower," signed to the note, are the name of a firm, of which all the defendants were members, and that, consequently, all the defendants are jointly liable. Dana died after the date of the note, but before suit brought. Seymour and Tower let judgment go by default. Jones, alone, contests the note ; he says that neither he nor Dana was members of the firm of Seymour and Tower.

The question is, were the words "Seymour & Tower," signed to the note, the name of a partnership composed of all four of the defendants, or composed only of Seymour and Tower.

It is not contested but that Seymour and Tower were partners ; the question is, were Jones and Dana partners with them ?

The question is not whether all these defendants were partners *inter sese*, but only whether they were partners as regards the plaintiff.

This necessarily opens an inquiry into the consideration of the note.

It appears by the case that, about the 1st of February, 1858, the Northern Railroad of New Jersey awarded to Seymour and Tower, two of the defendants, the contract for the erection and construction of their road from Hoboken to Pierpont, for the sum of $300,000.

The plaintiff was a track-layer, and the note in question was given him in part consideration for work done as such by him on this road, between the 8th of November, 1858, and the date of the note.

The question is, are all the defendants jointly liable for this track-laying? for, if they are, if not liable on the note, they are on the common counts for work and labor.

The court charged the jury, substantially that, under the law and the evidence, the plaintiff was not entitled to recover.

It appears by the case that although, as between the railroad company and Seymour and Tower, the contract for the erection and construction of the road was only between the railroad company and Seymour and Tower, yet that Seymour and Tower had a sub-contract (so far as appears, unknown to the company,) between them and one Thomas Cummings, by which they agreed, in consideration of *his valuable* services in persuading the company to award the contract for $300,000, to give said Cummings the equal one-third part of the net profits realized by them on said contract. This interest Cummings, on the 8th of November following, in consideration (as the bill of sale says) of $20,000 to him in hand paid, sold and assigned to the defendants, Jones and Dana. Jones and Dana having thus given $20,000 to Cummings for having persuaded the company that the erection and construction of the road was worth $300,000, take a bill of sale of his in-

terest to them; and then, on the 10th of November, four days afterwards, enter into a new agreement with Seymour and Tower. This latter agreement is in writing, signed by all the defendants, and dated November 10th, 1858. This agreement purports to be made between Seymour and Tower, of the first part, and Dana and Jones, of the second part; and after reciting that they, Dana and Jones, had bought out Cummings, with the consent of Seymour and Tower, and that said Jones and Dana had assisted in raising funds, and agreed to further assist in raising money for the completion of said road by the use of their and their friends' names and influence, provides, in consideration of the premises and of one dollar, that the said Seymour and Tower thereby agreed that the $20,000 aforesaid, given said Cummings, should be paid out of the contract price for the construction and equipment of said road, and charged to the account of profit and loss before any division of the profits on said contract, and for the same consideration that Seymour and Tower did thereby sell, assign, and transfer to said Jones and Dana the one-fourth part of the entire contract for the construction and equipment of said road, with all the profits, benefit, and advantage derived or to be derived from the construction and equipment under the contract, it being the intention of said agreement to make the interest of said Jones and Dana equal, in all respects, with the interest of Seymour and Tower in said contract. It was further provided by said agreement, that the parties were to be equally interested in all future contracts which should be thereafter taken by any or either of the parties for the construction and equipment of any roads in extension of or branching from said railroad, and all other transactions growing out of the building of said road, unless one of the parties to said agreement should elect otherwise, in which case the remaining parties should be equally interested therein. The business connected with the contract aforesaid to be conducted in the name of "Seymour and Tower."

Voorhees v. Jones.

These writings established the legal relationship between all the parties thereto. Under it, the parties went on and built the road. Under it, Seymour and Tower, as we must assume from the case, actually, physically, spoke to and employed the plaintiff to lay the track, and gave the note in question for it.

The question is, whether, under the relationships established by these writings and the evidence in the cause, the employment of the plaintiff was the joint act of all the defendants. The question resolves itself into this: who, in the spring of 1859, when this track was being laid by the plaintiff, was building this road—was it Seymour and Tower, or was it all the defendants? If it was only Seymour and Tower, the verdict was right; if all the defendants, it was wrong.

The question is not, who was building this road, as between Seymour and Tower and the railroad company, but the question is, who was building it, as regards all the defendants, *inter sese.* If Jones and Dana, by this writing, only loaned money to Seymour and Tower to enable them to go on and build the road, they would be only lenders, and not engaged in building the road; if they were to do certain work, and to get their pay by being paid a certain portion of the profits, like seamen on a whaling voyage, they would be in no legal sense the builders of the road. But if, by the operation of their contract, they became owners in part of the subject matter, and were to share jointly, as *inter sese,* in the loss and profits of the venture, then they are no longer the seamen, who take their wages by a certain share of the profits, but the owners of the vessel, who are jointly liable for the repairs done to her, and for the sails and provisions furnished her. Were Jones and Dana sailors getting their wages in a share of the profits, or owners jointly liable for the outfit?

The question is not whether Cummings, by his contract, became owner or sailor. It may be that he so navigated his vessel as not to cross the mathematical line be-

tween individual and joint liability. He certainly sails very closely and with great skill along that line, and indicates that his services might be very valuable in persuading a railroad company to award $20,000 more for a contract than it was worth, if his astuteness in making a bargain is equal to that in drawing the contract. But, unfortunately for the defendants, the question is, if they, under the pressure of self-interest, have not fallen too far to leeward ?

Let us now take up this agreement of the 10th of November, 1858.

What is its legal effect? It is, in legal effect, an agreement between all these defendants, that they will all, *inter sese*, unite and build this railroad. What the contract was between Seymour and Jones and the railroad company, or whether there was any at all, is a matter foreign to the present dispute. It is a matter of indifference if there was, as between them, a contract at all. All these defendants, by the contract of the 10th November, 1858, agree, *inter sese*, to go on and build this road.

By the contract between Seymour and Tower and the company, they, Seymour and Tower, were to build the road. They commenced so doing; but they had a right, at any time, to say to any third parties, come in and help us, and we will divide the profits with you. If they did, that was a matter only between themselves, and with which the railroad company had nothing to do. Those who might thus afterwards come in on the invitation of Seymour and Tower were from thenceforth necessarily jointly engaged in building the road.

Did Jones and Dana thus come in ?

The contract of the 10th of November appears to me to be as explicit as words can make it. Its language is, we, Seymour and Tower, sell, assign, and transfer unto Jones and Dana the one-third part of the entire contract for the construction and equipment of said road, with all the profits, benefits, and advantages derived or to be de-

rived from the construction and equipment under the contract, it being the intention of said agreement to make the interest of said Jones and Dana equal, in all respects, with the interest of Seymour and Tower in said contract; in consideration of which, Jones and Dana agree to assist in raising money for the completion of said road. Seymour and Tower sell Jones and Dana the third of the entire contract for the building of the road, with all the profits, and give them an interest, equal in all respects to their own, in the contract; and they, Jones and Dana, agree to assist in raising money for the completion of the road. This was a bargain which the parties were competent to make, and did make. By this contract, by its express terms, Jones and Dana take an interest in the contract equal in all respects with Seymour and Tower. The interest of Seymour and Tower in the contract with the company was to build the road and divide the profits. The intent of all the defendants, after the contract of the 10th November, was to build the road and divide the profits. After the contract of the 10th November, all the defendants under it had a common purpose to build the road and divide the profits. After the 10th of November, every act done upon the road was done under such common purpose, and every act so done by one was, in contemplation of law, done by all.

There is no difference in principle between building a railroad and building a house. If four persons have a common purpose to build a particular house, and one employs the men, all are bound. So here all these defendants, after the contract of the 10th of November, by its very terms, had a common purpose to build this road, and if one employed the track-layer, all are bound.

It is suggested that, under the contract of the 10th of November, Jones and Dana only agreed to loan Seymour and Tower either their names or their money, and that for so doing they were to be paid a certain portion of the profits, and that it is like the case of sailors on a whaling

voyage agreeing to receive their wages in a specific share of the profits. But the money to be advanced here was clearly not to be in the nature of a loan, but of an advance by them as owners of the contract, and not as laborers for hire, and they are liable for work done on the road, as much so as the owner of the whaling vessel for painting her or for a new set of sails. The distinction is very obvious. Suppose, with funds thus advanced by Jones and Dana, $100,000 worth of iron, $20,000 of sleepers, and $70,000 of rattling steel, had been purchased, and were lying on the ground, before it was formally delivered to the company, whose property would it have been? If this suggestion be correct, it would have been the property of Seymour and Tower, and liable to have been seized at any moment for their individual debts; but if Jones and Dana were jointly interested in the contract itself, not a rail of it could have been touched until after all the joint liabilities had been satisfied, including all advances by Jones individually. Thus it may very easily be seen how it happened that Jones and Dana preferred standing towards Seymour and Tower in the relation of partners, rather than in that of lenders.

If, then, after the contract of the 10th November, all these defendants were acting in the common purpose of building this road, we need cite no law to prove that in hiring the track-layer the act of one was the act of all, and that all are jointly liable whether the proceeding be upon the note or for money had and received.

The verdict must be set aside.

Justices OGDEN and BROWN concurred.